UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS LAMAR JAMES,<br>　　　　Plaintiff,<br>　　v.<br>OAKLAND POLICE DEPARTMENT, et al.,<br>　　　　Defendants. | Case No. 13-cv-00011-SI<br><br>**ORDER GRANTING SUMMARY JUDGMENT FOR LAW ENFORCEMENT DEFENDANTS**<br><br>Re: Dkt. No. 96 |

Dennis Lamar James, Jr., filed this *pro se* civil rights action under 42 U.S.C. § 1983 concerning his arrest on February 19, 2012 and hospital stay later that day. This action is now before the Court for consideration of the law enforcement defendants' motion for summary judgment.[1] James opposes the motion. For the reasons discussed below, summary judgment will be granted in favor of the law enforcement defendants.

**BACKGROUND**

The following facts are undisputed unless otherwise noted:

Before turning to the incident that gives rise to James' complaint, a brief explanation of the workings of a Taser is helpful. According to Oakland police officer Ryan Kabahit, who is not a defendant and who trains officers in the workings and use of Tasers:

> Tasers use compressed nitrogen to propel two probes with wires, one at a straight angle and the other at an eight-degree downward angle. A deployment discharges the probes and a five-second electrical pulse. A taser works best when an officer uses it at a seven to fifteen foot distance. That distance gives probes the best

---

[1] This order addresses the motion filed by the law enforcement defendants. Docket No. 96. The motion filed by the doctor/medical defendants (Docket No. 80) will be addressed in a separate order.

> chance to land ideally spaced--the space between the probes is called the "spread"--to create an effective electrical circuit. If only one probe makes contact, the deployment will be ineffective. The same is true if there is an insufficient spread or poor contact. A louder sound marks a poor connection.
>
> Once both probes reach a person, the electrical energy--called a waveform--should cause neuro-muscular disruption. That is when the waveforms overpower the normal electrical signals within nerve fibers. When both probes reach a person's body and stay within one inch of it at the proper spread, the waveform should incapacitate the person. [¶] Once the probes are discharged, an officer may activate the taser more times to send additional cycles of electrical charge. To fire another set of probes, an officer must first change the cartridge.

Docket No. 96-4 at 2-3.[2]

Officer Kabahit also explained that a Taser is a force option for police officers to gain control over a person who is dangerous and violent. "Using a taser allows an officer to stay out of a person's striking distance, potentially preventing the officer's need to use other types of force" and thereby potentially lowering the risk of harm to the officer and person being tased. *Id.* at 2.

Yvette Thigpen, who was about 58 years old at the time, lived in the senior housing apartment complex at 1720 MacArthur Boulevard in Oakland. Docket No. 96-14 at 2-3. On February 19, 2012, she was in the parking lot of the complex when James attacked her. "He ran up to me when I was standing there and approached me and asked me to give him a kiss, and I pushed back, and he just grabbed my face." Docket No. 96-14 at 4. She told him "no," but could not get away. *Id.* at 5. James then began "biting my mouth and trying to put his tongue down in my mouth." *Id.* According to Thigpen, "I was just trying to keep him from mangling my face up, because he had all this tore up and open." *Id.* at 5-6. She was afraid: "I was just thinking my life was threatened, and he was trying to take me out. I mean, hurt me, just bodily harm me." *Id.* at 8. Blood was "streaming down" from her lips. *Id.* at 7-8, 9.

Meanwhile, Oakland police officer Ko responded to a call in the early afternoon at the senior housing apartment complex. Docket No. 96-9 at 3-4. The call was a "5150(b) call," which officer Ko understood to mean there was "a mentally disturbed person [who] is violent." Docket

---

[2] A Taser also may be used as a stun gun, where the device has two electrical prongs and, upon activation while in direct contact with a person, an electrical current flows between the prongs. *See Caetano v. Massachusetts*, 136 S. Ct. 1027, 1029 n.2 (2016) (per curiam); *see also* Docket No. 96-10 at 2 (describing Taser's "Push Stun" mode). In dealing with James, the Oakland police officers did not use Tasers in this manner.

2

No. 96-9 at 3; *see also* Docket No. 38 at 2.

Once officer Ko reached the parking lot, he saw James. Officer Ko saw James mumbling and "basically standing in between . . . two vehicles, and he's running back and forth, kind of full speed into the vehicle, the parked vehicles." *Id.* at 7. James describes himself as having been "a mental patient" in a "psychosis." Docket No. 38 at 3. James was wearing shorts and socks.

Officer Ko also saw an "elderly female" (i.e., Yvette Thigpen) seated on the concrete curb near James. Docket No. 96-9 at 8; Docket No. 96-14 at 3. Thigpen was cupping her mouth, had blood streaming from that area and had blood on her hands. *Id.* Officer Ko waved at her and told her to come toward him, but she did not respond. *Id.* Officer Ko also commanded James to get on the ground. *Id.* at 9. James, who was about six to eight feet from Thigpen, did not comply with officer Ko's instruction; instead, he turned and "kind of tackled" Thigpen "into the landscaping," wrapped his arms and legs around her from behind her, and it appeared to Ko "like he was trying to kiss her." *Id.* at 9, 19. Thigpen appeared to officer Ko to be in shock and "basically didn't do anything." *Id*. at 10. Officer Ko ran over, grabbed James and pulled him off Thigpen. *Id.* At that point, James laid in the landscaping for a little bit mumbling; officer Ko backed off and tried without success to get Thigpen to come to him. *Id.* Officer Ko had his Taser out, but had not yet fired it. *Id.* at 11.

Officer Ko drew his Taser because James did not comply with commands, got back onto his feet, clenched his fists, lowered his body a little bit, and took a step forward toward Ko. As soon as James took a step forward, officer Ko fired his Taser at James, and James fell immediately to the ground. *Id.*[3] Officer Ko continued to try to get Thigpen to come over to him, without success. As officer Ko was trying to get Thigpen to come to him and telling James to stay put,

---

[3] At the time, the other means of force available to officer Ko included physical hands-on restraint, an expandable baton and pepper-spray. Officer Ko stated that officer safety played a "very huge" role in selecting the means of force because, if an officer is armed and gets knocked out, the suspect can get the officer's gun or other weapons and hurt someone. Docket No. 96-9 at 12-13. Officer Ko stated that, due to him being alone when he first arrived, as well as James' "size, physical stature, muscular build, it wasn't a good idea for me to go hands on with him." *Id.* at 13.

3

James crawled back to Thigpen and tried to grab her again. *Id.* at 13.[4] Officer Ko fired his Taser a second time, but James managed to lunge at Thigpen, knocking her over from her sitting position and grabbing her. Officer Ko then fired his Taser a third time. James held on to Thigpen as officer Ko tried to pull Thigpen away from James. Officer Ko fired his Taser for the fourth time and freed Thigpen from James.

Officer Ko repeatedly commanded James to let go of the keys in his hand -- which officer Ko thought could be used as a weapon -- and to get down on the ground. James refused to comply with any verbal command. In the video recording, officer Ko can be heard warning James to stay on the ground or he would be tased. Docket 96-9 at Ex. A (recording at 1:46).

James stood up, with keys in hand, and tried to get into a car parked in the lot. Officer Ko was concerned about James getting into the car because he could "drive off and injure a lot of people." Docket No. 96-9 at 23. James then turned around and advanced toward officer Ko, disregarding orders to get to the ground. Officer Ko fired his Taser a fifth and sixth time, with no effect. By this time, Oakland police officer Chacon and sergeant Steinberger had arrived.[5]

James advanced toward the officers. Officer Ko then fired his Taser for the seventh time, without any effect on James. James then tried to get into a gold Lexus parked in the lot. Officer Chacon fired her Taser, but only one of the probes struck James and it had no effect. Meanwhile, officer Ko changed Taser cartridges and fired his Taser for the eighth time, with no effect. James turned around and advanced toward officer Chacon and sergeant Steinberger, who tried to grab James. Officer Chacon fired her Taser a second time, causing James to fall to the ground.

---

[4] After he first fired the Taser, Officer Ko turned on a portable video recording device clipped to his shirt, and the rest of the encounter is video-recorded. Officer Ko had turned on the recorder when he got out of his car, but it shut off inadvertently; he restarted it when he realized it was not on. Docket No. 96-9 at 14-15. The rest of the encounter is video-recorded. Docket No. 96-9 at Ex. A (DVD, physically lodged with the court).

[5] Officer Chacon declares that she responded to Oakland police department dispatch reports "that a man--who was wearing only shorts and socks--was being 'very aggressive' and hitting people. Dispatch also reported that the man was running around, screaming, and trying to get into the building" at the senior complex. Docket No. 96-3 at 2.

Once James was on the ground, the officers tried to handcuff him, and he struggled against them. Officer Chacon fired her Taser a third and fourth time while James continued to struggle against the officer. James eventually was handcuffed and held face down on the ground, although he tried to get up several times. Officer Ko quickly made a radio call summoning medical aid for James and Thigpen.

Sergeant Smith arrived once James was already in handcuffs. Docket No. 96-7 at 2. Sergeant Smith did not use a Taser during the incident. *Id.* While the officers waited for the EMTs to arrive, sergeant Smith stayed by James' side, verbally encouraging James to relax. James states that sergeant Smith "caused even more injuries to the plaintiff's hip and right leg," although he does not explain how this occurred. Docket No. 38 at 3. Former Oakland police chief Jordan was not present during the incident.

The video recording also shows that, while James was lying on the ground after being handcuffed, officer Ko checked on Thigpen, who was bleeding from her mouth, and encountered a young woman who told him that James had abruptly attacked her boyfriend before attacking Thigpen. The video recording also shows that, while James was lying on the ground, he was mumbling incoherently and occasionally trying to get up. Once the EMTs arrived, they prepared James for transportation: a neck collar was applied, then the officers and EMT personnel exchanged the handcuffs for leather restraints, put James on a backboard, restrained him to that backboard, and then wheeled him away on a gurney.

Defendants presented undisputed evidence about the effectiveness of the Taser activations here, based on the logs for each of the Tasers and the video recording. (They apparently gauge a Taser activation as fully effective when it caused James to fall to the ground, partially effective when it disrupted but did not stop James' immediate activity, and ineffective when it had no effect on James' behavior.) Officer Ko activated his Taser nine times. Of those nine activations, five were ineffective, three were partially effective, and one was fully effective. Officer Chacon activated her Taser four times. Of those four activations, one was ineffective and three were only partially effective (in that James continued to struggle). The thirteen activations took place within less than four minutes. Officer Ko's first activation, which was his only fully effective activation

5

of the Taser, took place approximately 40 seconds before the second activation. Docket No. 96-11 at 3. James states that he was tased over ten times, which is not inconsistent with this evidence. Docket No. 38 at 3.

James was taken to the hospital, treated in the emergency room, and released to be taken to jail later that day. His injuries included three Taser barbs stuck in his skin and abrasions on various parts of his body. He also arrived with an altered mental state, and an initial score of 8 on the Glasgow Coma Scale, which runs from 0-15.

James was eventually tried on charges of mayhem and assault by means of force likely to produce great bodily injury. *See* Cal. Penal Code § 203, 245(b). *See* Docket No. 96-13 at 2. A minute order submitted by defendants lists convictions for these two counts, but also has a notation that, pursuant to California Penal Code section 1026, the court "orders defendant committed to Napa State Hospital for a max. term of 21 years." Docket No. 96-13 at 2. California Penal Code section 1026 allows for the commitment of a defendant to a state hospital if he is found to have been insane at the time of the commission of the offense.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to this action occurred in Alameda County, located in the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since

a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & fn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as an opposing affidavit where, even though verification was not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, James' complaint was signed under penalty of perjury and, therefore, is considered as evidence for purposes of deciding the motion.

The court's function on a summary judgment motion is neither to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id.* at 631. "If direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *Id*.

**DISCUSSION**

A.     Excessive Force Claim

The constitutional right at issue when it is alleged that a law enforcement officer used excessive force in the course of an arrest or other seizure is the Fourth Amendment right to be free from "unreasonable . . . seizures." U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394, 395 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). Because the reasonableness standard is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The most important *Graham* factor is the immediacy of the threat posed to the safety of the officers or others. *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir. 2005) (en banc). Courts also consider the "quantum of force used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (citations omitted). The reasonableness inquiry in excessive force cases is an objective one, meaning that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

In conducting the balancing required by *Graham*, the Court first assesses "the gravity of the particular intrusion on Fourth Amendment interests," then assesses "the importance of the government interests at stake," and then "balance[s] the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Young v. County of Los Angeles,* 655 F.3d 1156, 1161 (9th Cir. 2011) (internal quotation marks omitted).

The first step is to consider "the nature and quality of the alleged intrusion." *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012). Here, officers Ko and Chacon fired their Tasers against

8

James. A Taser, "when used in dart-mode constitute[s] an intermediate, significant level of force that must be justified by the governmental interest involved." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). The force used on James was indisputably a significant use of force. Significantly, however, although the officers activated their Tasers thirteen times, James did not experience thirteen electrical shocks because so many of the activations failed to make proper contact and were ineffective. The video shows repeated Taser activations without any visible effect on James, and other Taser activations with only a fleeting disruption of James' activities. Nonetheless, two of the Taser activations had the results described in *Bryan*, i.e., an "electrical impulse instantly overrid[ing] the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless," and "experienc[ing] an excruciating pain that radiates throughout the body." *Bryan*, 630 F.3d at 824. There also was some force used to subdue and handcuff James, once the officers grabbed hold of him. And there was minimal force used to keep him on the ground once he was handcuffed.

Having determined that there was a significant intrusion on James' Fourth Amendment interests, the Court next considers the "countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.

Severity of the crimes: The officers were responding to a serious and violent crime, albeit by a reportedly mentally ill person. The officers received reports that James was attacking people and trying to break in to the complex. James had attacked Thigpen and had bitten her in the mouth. James ultimately was convicted of mayhem and assault by means of force likely to produce great bodily injury, both felonies carrying significant prison sentences, although he was committed to a mental hospital instead of prison under California Penal Code section 1026. *See* Cal. Penal Code § 204 (mayhem punishable by imprisonment for two, four or eight years); Cal. Penal Code § 245(a)(4) (assault by means of force likely to produce great bodily injury punishable by imprisonment for two, three or four years).

Immediacy of threat: The "most important" *Graham* factor is whether the person "posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). James unquestionably presented an immediate and ongoing threat until he was

1    handcuffed and pinned on the ground by the police officers.

2    James posed a threat to the officers as well as the area residents. Even though James was
3    not armed with a traditional weapon (such as a knife or gun), and was wearing only shorts and
4    socks, he did have keys in his hand. Officer Ko thought the keys could be used as a weapon.
5    Additionally, James' failure to comply with orders even after he had been tased, and his decision
6    instead to step toward officer Ko, who was yelling at him to get on the ground, posed a threat to
7    officer Ko, and then to the other officers who arrived later. Further, James' continued struggle
8    with the other officers as they tried to subdue and handcuff him posed at least some threat of
9    danger to those officers.

10   <u>Active resistance and flight</u>: The undisputed evidence in the record shows that James
11   actively resisted throughout the encounter, which lasted about four minutes before he was
12   handcuffed and restrained on the ground. James failed to heed the officers' instructions to stay
13   away from the victim, to get off the victim after he tackled her, to get on the ground, and to stay on
14   the ground. Not only was he not heeding commands, he was attacking a woman and then
15   advancing toward the officers. After several officers arrived to assist officer Ko, James continued
16   to struggle to avoid being taken to the ground and then struggled to avoid being handcuffed. Even
17   after he was handcuffed and lying on the ground, he attempted to rise up several times, only to be
18   held in place by the officers at his side. *See generally Scott v. Harris*, 550 U.S. 372, 380-83
19   (2007) (police officer entitled to summary judgment based on qualified immunity in light of video
20   evidence capturing plaintiff's reckless driving in attempting to evade capture which utterly
21   discredits plaintiff's claim that there was little or no actual threat to innocent bystanders).

22   Further, James had keys in his hand and was attempting to get into a car at one point.
23   Officer Ko reasonably perceived a flight risk, as it was unclear whether James intended to merely
24   enter the car or to also drive away in it. Not only would James have presented a flight risk if he
25   had been able to drive the car, he might have used it to further injure people.

26   <u>Quantum of force used</u>: There is an immaterial dispute as to the amount of force used in
27   effectuating James' arrest. He presents evidence that he was tased ten times, whereas defendants
28   present evidence that it was thirteen times. For present purposes, the court will accept that there

were thirteen Taser activations. James does not dispute defendants' evidence that many of the activations of Ko's and Chacon's Tasers were ineffective. The video recording confirms defendants' documentary evidence in that it shows James having absolutely no reaction to many activations of the Tasers. The Tasers fired at James amounted indisputably to a "significant level of force," *Bryan*, 630 F.3d at 826, although he experienced far fewer than thirteen electrical shocks from the Tasers because so many of the activations failed to make proper contact. Additionally, as the video recording plainly shows, James was not tased at any time during which he was complying with officers' instructions or was passive. *Cf. Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093-96 (9th Cir. 2013) (holding that plaintiff alleged a constitutional violation where he was tased in dart-mode as a bystander who engaged in no resistance, and that the officer was not entitled to qualified immunity because at the time it was "beyond debate" that using non-trivial force in response to such passive bystander behavior would be unconstitutionally excessive); *Mattos*, 661 F.3d at 433-48 (although a minimally resisting plaintiff alleged a constitutional violation for use of Taser in drive-stun mode, defendant was entitled to qualified immunity because the law was not clearly established at the time of conduct).

The other uses of force, i.e., to take the struggling James to the ground and hold him while handcuffing him, and holding him on the ground until the ambulance arrived, were minor uses of force, most certainly not out of line with the resistance he offered. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (use of force necessary to put handcuffs on arrestee who stiffened her arm and attempted to pull free to avoid handcuffing was not excessive).

<u>Injuries</u>: The injuries James received were moderate. James' injuries consisted of having the immediate pain of the tasing, as well as having three Taser barbs stuck in him that were removed at the hospital that day. He also had abrasions on his face and knees, although there is no evidence whether those occurred as a result of the tasing or before the officers arrived when he was banging his head on cars, or during his attack on Thigpen. James also states that he had injuries to his hip and right leg. Docket No. 38 at 3. He claims that an orthopedic doctor at the jail examined his injuries, *see* Docket No. 67 at 2, but he fails to attach any medical records

11

reflecting any such treatment. *Cf. Arpin*, 261 F.3d at 922 (giving no weight to plaintiff's claim of injury resulting from handcuffing where she did not provide any medical records to support claim of injury during handcuffing).

Efforts to temper use of force: The evidence in the record shows that the police officers made several attempts to temper the severity of their response. Although officer Ko does not state that he gave a verbal warning that he was about to fire his Taser at James before he first fired it, the evidence is undisputed that James had not complied with officer Ko's command to get on the ground and instead attacked Thigpen.[6] Officer Ko did not go straight to the Taser; in fact, he did not even deploy it when James first attacked Thigpen in his presence. Officer Ko initially was able to pull James off Thigpen. Officer Ko first fired his Taser only when James continued to refuse to follow commands and instead advanced toward officer Ko, with keys in hand, after he had attacked Thigpen. Although that tasing momentarily stopped James, he crawled back to Thigpen and attacked her again. Officer Ko fired his Taser again while James was on Thigpen and Ko was trying to pull Thigpen from James. Officer Ko also repeatedly issued commands to James, which James failed to heed. And officer Ko at least once can be heard on the video recording warning James to stay on the ground or he would be tased, but James continued to disobey the commands -- getting back up off the ground and trying to get in the car, then advancing on officer Ko, then advancing on the several officers -- all the while ignoring their commands.

Additionally, the very fact that the officers did not escalate to shooting James with pistols or beating him with batons after the rather unimpressive results of the Taser activations reflects

---

[6] Although not known to the officers on the scene, James had a history of not complying with commands of law enforcement officers. A pattern of non-compliance with law enforcement orders and physical resistance by James, followed by the use of force on him, is evident in three other cases he has filed in this court. *See James v. Maguire Correctional Facility*, No. 10-1795 SI (non-compliance with orders and physical resistance, followed by use of force, in cell search); *James v. Hayward Police Department*, No. 10-4009 SI (non-compliance with orders, flight, resistance, followed by use of force during one arrest; and non-compliance and physical resistance, followed by use of force during another arrest); *James v. Hayward Police Department*, No. 13-1092 SI (triable issue as to whether James resisted and fled before officers used force to arrest him).

some effort to temper their response. Certainly officer Ko – who was alone against James for a couple of minutes, and repeatedly activated his Taser without anything more than temporary success in stopping James, who was both attacking a helpless 58-year old woman and advancing on officer Ko at very close range -- tempered his response by not escalating to another method of force beyond activating his Taser.

Other factors:  In evaluating objective reasonableness, the court "often must look beyond *Graham*'s enumerated factors and consider other elements relevant to the totality of the circumstances." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013).  James argues that his mental illness is just such a factor.  He is correct that a plaintiff's "mental and emotional state" is a factor that may be considered.  *Luchtel*, 623 F.3d at 980.  Here, the events unfolded so rapidly that there was no opportunity to wait out the arrestee, or step back, or make any special accommodations for his mental illness or self-described psychosis.  Regardless of whatever mental illness propelled his behavior, he does not dispute that he had attacked, bitten and chewed on a woman's face before officer Ko arrived, and that he (James) attacked her twice more in officer Ko's presence.  Officer Ko could not reasonably be expected to allow that woman to be further hurt simply because her attacker was in the throes of a mental crisis.  This situation is unlike those cases where a mentally ill person is merely making verbal threats and perhaps holding a weapon at his side – James indisputably already had committed a violent crime and was advancing on the officers who were in very close proximity.

James points out that officer Ko failed to call an ambulance or a "crisis and intervention team" upon his arrival, Docket No. 101 at 2, but fails to provide any explanation of how that would have affected the use of force.  The use of force all took place within just a few minutes of officer Ko's arrival, and James provides no evidence that an ambulance or "crisis and intervention team" would have arrived in time to have any effect.  *See* Docket No. 96-11 at 3 and 5; video recording.  In fact, once James was handcuffed, officer Ko made a radio call requesting EMT personnel for Thigpen and James but, as the video recording shows, many minutes passed before the EMT personnel arrived.  This suggests that, even if officer Ko had called for an ambulance as he pulled into the parking lot, the ambulance would not have arrived in time to affect the use of

force in any way. Further, James presents no evidence that the ambulance personnel would not have required the police officers to subdue the arrestee before they administered any sort of care to him.

Finally, the Court must balance the foregoing factors to resolve an excessive force claim. "Allow[ing] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 397, the Court concludes as a matter of law that the officers did not use excessive force. No reasonable jury could find that defendants applied an excessive amount of force during the arrest of James. *See, e.g., Miller v. Clark County*, 340 F.3d 959, 963-68 (9th Cir. 2003) (use of trained police dog to "bite and hold" suspect until officers arrived on the scene less than a minute later does not constitute unreasonable excessive force under 4th Amendment when suspect poses immediate threat to officers' safety, several attempts to arrest suspect with less forceful means are unsuccessful as a result of suspect's defiance, and use of police dog is well-suited to task of safely arresting suspect).

B.   Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. First, the court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no constitutional right was violated under the alleged facts, the inquiry ends and defendants prevail. *Id.* If a violation is shown, the court must consider whether that right was clearly established. "'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' The relevant, dispositive inquiry in determining whether a right is clearly established is

14

whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although *Saucier* required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Defendants are entitled to qualified immunity on the claim that they used excessive force. As explained above, the evidence in the record does not establish a violation of James' Fourth Amendment rights during his arrest. Defendants prevail on the first step of the *Saucier* analysis. Defendants are entitled to judgment as a matter of law on the qualified immunity defense against James' claim that they used excessive force on him.

### C. Municipality and Police Chief

Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort, *see Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); however, a city or county may not be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior, *see Board of Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). To impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: (1) that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy is the moving force behind the constitutional violation. *See Plumeau v. School Dist. #40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). In order to survive summary judgment on a claim of liability based on failure to train or supervise, plaintiff must provide evidence indicating what training practices were employed by the municipality at the time of the alleged constitutional violation or what type of constitutionally-mandated training was lacking. *See Waggy v. Spokane Cnty.*, 594 F.3d 707, 713-14 (9th Cir. 2010).

Assuming, arguendo, that James was deprived of a constitutional right, James fails to show

that the officers acted pursuant to a custom, policy, or practice of the municipal defendants that resulted in a constitutional deprivation. *See Plumeau*, 130 F.3d at 438. James claims that the alleged constitutional violations occurred due to the failure of the Oakland Police Department and Oakland police chief Jordan to provide training and supervision regarding the lawful use of an officer's Taser. Docket No. 38 at 5. He provides absolutely no evidence in support of this assertion, however. Without any supporting evidence, James' conclusory allegations are insufficient to raise a triable issue that the municipal defendants have an unconstitutional policy or custom. *See Waggy*, 594 F.3d at 713 (upholding grant of summary judgment for defendants on plaintiff's *Monell* claims, where plaintiff failed to point to an express constitutionally impermissible county policy or custom). The Oakland Police Department and chief Jordan are entitled to summary judgment in their favor.

Insofar as James is urging that sergeant Smith failed to adequately supervise the officers, he fails to present any evidence in support of this assertion. A supervisor may be liable under § 1983 upon a showing of (1) personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). A supervisor therefore generally "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Sergeant Smith was present and stayed by James' side while James was in handcuffs, but there is absolutely no evidence in support of a claim that he used excessive force on him, or that he directed the actions of other officers before he arrived on the scene, whose conduct also did not amount to excessive force.

## CONCLUSION

For the foregoing reasons, the law-enforcement defendants' motion for summary judgment is GRANTED. Docket No. 96. Judgment will be entered in their favor and against plaintiff.

**IT IS SO ORDERED**.

Dated: June 13, 2016



16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California