UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS LAMAR JAMES,<br><br>    Plaintiff,<br><br>    v.<br><br>OAKLAND POLICE DEPARTMENT; et al.,<br><br>    Defendants. | Case No. 13-cv-00011-SI<br><br>**ORDER GRANTING SUMMARY JUDGMENT FOR DRS. ENGLISH, ADLER AND KANG**<br><br>Re: Dkt. No. 80 |

Dennis Lamar James, Jr. filed this *pro se* civil rights action under 42 U.S.C. § 1983 concerning his arrest on February 19, 2012 and hospital stay later that day. All of the claims in this action have been resolved in other orders, except for James' claims against three doctors for professional negligence and fraud. Those three doctors now move for summary judgment on the professional negligence and fraud claims. James opposes the motion. For the reasons discussed below, summary judgment will be **GRANTED** in favor of doctor-defendants. Judgment will now be entered against James on all of his claims.

**BACKGROUND**

The following facts are undisputed unless otherwise noted.

Before turning to the chronology of events, it is necessary to briefly explain the Glasgow Coma Scale ("GCS"), which is used by medical personnel "to provide a reliable, objective way of recording the conscious state of a person for initial as well as subsequent assessment. A patient is assessed against the criteria of the scale, and the resulting points give a person [a] score between 3 (indicating deep unconsciousness) and 15 (fully awake person)," based on eye, verbal, and motor

1 responses. Dkt. No. 80-1 at 85.[1]

2 On February 19, 2012, Oakland police officers responded to reports that a man was banging his head on cars and attacking people. *See* Dkt. Nos. 96-9 at 3-4; Dkt. No. 38 at 2. Oakland police officers arrested James, and fired Tasers at James repeatedly during the course of his arrest. Dkt. No. 38 at 2. After he was arrested, James was taken by ambulance to Highland Hospital in Oakland. *Id.* at 6.

The three moving defendants are Dr. Naomi Adler, Dr. David English, and Dr. Eugenia Kang. Dkt. No. 80 at 5. These three doctors were licensed to practice medicine in California and worked at Highland Hospital on February 19, 2012. *See* Dkt. No. 80-2 at 53-78.

In the field, before he arrived at the hospital, James had a GCS score of 8. Dkt. No. 80-1 at 46, 58.

James arrived at Highland Hospital at approximately 2:49 p.m. Dkt. No. 80-2 at 5. He was made a "Level 1 trauma activation" because his GCS in the field was "only 8." *Id.*

Dr. English and Dr. Adler evaluated James in the emergency department. *Id.* Dr. English noted that James' vital signs were within normal limits and that there were Taser barbs in James'

---

[1] The possible scores in the "eye" category for the GCS are:

1 = does not open eyes
2 = opens eyes in response to painful stimuli
3 = opens eyes in response to voice
4 = opens eyes spontaneously

The possible scores in the "verbal" category for the GCS are:

1 = makes no sounds
2 = incomprehensible sounds
3 = utters inappropriate words
4 = confused, disoriented
5 = oriented, converses normally

The possible scores in the "motor" category for the GCS are:

1 = makes no movements
2 = extension to painful stimuli
3 = abnormal flexion to painful stimuli
4 = flexion/withdrawal to painful stimuli
5 = localizes painful stimuli
6 = obeys commands

2

1    left anterior chest, left abdominal flank, and left bicep. *Id.* Dr. English also noted normal heart
2    rate and rhythm, as well as extensive abrasion on both hand and knees. *Id.* Dr. English noted no
3    suicidal ideation. *Id.* Dr. English noted that James' GCS was 9. *Id.*; Dkt. No. 80-1 at 45.

4        Dr. Kang also evaluated James and noted that he had been tased and had an altered level of
5    consciousness and a GCS of 8 in the field. Dkt. No. 80-2 at 5; *see also* Dkt. No. 80-1 at 58.
6    James had brow, cheek and chin abrasions and Taser barbs in his left chest, left flank and left
7    biceps, and a GCS improved to 10 on Dr. Kang's assessment. Dkt. No. 80-2; *see also* Dkt. No. 80-
8    1 at 58. Chest x-ray and CT scans to assess plaintiff's head, face, cervical spine, chest, abdomen
9    and pelvis were obtained. Dkt. No. 80-2 at 5. The Taser barbs were removed and plaintiff's
10   wounds were cleaned and covered with sterile gauze. *Id.*

11       Arturo Garcia, M.D. (who is not a defendant) also evaluated James and noted normal vital
12   signs, multiple abrasions to the face, abrasions and swelling to the right forehead, abrasions to the
13   right periorbital area and right maxilla. *Id.* James' pupils were equal, round and reactive to light,
14   and it was noted that he might have a broken right incisor. *Id.* His heart had a regular rate and
15   rhythm with 2+ femoral pulse, and abrasions to bilateral knees, toes, wrists, knuckles and his right
16   shoulder. *Id.* Dr. Garcia documented a GCS of 9, and that plaintiff was opening his eyes to voice,
17   and continued not to phonate, although he appeared to understand everything that was said, as he
18   followed all directions. *Id.* In addition, plaintiff was noted to have three Taser darts lodged in his
19   subcutaneous tissue in his left chest, left biceps and left flank. *Id.* at 5-6. Dr. Garcia also noted
20   that the results of a chest x-ray and CT scans of plaintiff's head, face, cervical spine, chest,
21   abdomen and pelvis were all negative. *Id.* at 6. Dr. Garcia's clinical impression stated: "This is a
22   36-year-old gentleman [who] came in because of altered mental status resisting arrest [and]
23   multiple [T]aser injuries. Other than some superficial abrasions and broken right incisor, he had
24   no other visible injury clinically or on imaging studies. His C-spine was cleared and he was stable
25   enough for discharge into custody. He will just need to follow up with OMFS for his broken
26   tooth. Currently, his abrasions are being thoroughly washed and TTS will be performed prior to
27   discharge." *Id.*
28

3

During James' stay at the hospital, attending trauma surgeon Terence Liu, M.D., communicated with the trauma team residents, who informed Dr. Liu of James' condition, the residents' assessment, the results of the chest x-ray and several CT scans that were negative, and their plan to treat plaintiff as documented in his medical records. *Id.*

At approximately 6:10 p.m., a trauma team resident completed the Tertiary Trauma Survey (also known as "TTS"), which serves as the trauma team's "once over" of a patient before discharge. *Id.* As part of the TTS, the trauma team again reviewed James' vital signs, GCS, injuries, and negative x-ray findings and determined that he was stable for discharge. *Id.* The TTS form from the hospital shows GCS scores of "E: 3 V: 5 M: 6," which would yield a GCS of 14. Dkt. No. 80-1 at 56.

James was discharged at 6:45 p.m., given instructions, and prescribed medications which were reviewed with him. Dkt. No. 80-2 at 6. His vitals remained stable. *Id.* James was given prescriptions for Vicodin and Colace and he was referred to the dental drop-in clinic. *Id.* James was escorted through the ambulance bay by Oakland Police Department officers, *id.*, with James leaving in a wheelchair. Dkt. No. 101 at 20.

The parties disagree as to whether James spoke when he was at the hospital. According to James, he "was nonverbal" and "no doctor ever asked [him] any questions" during his stay at the hospital. Dkt. No. 101 at 19. But James also states that he was "not totally conscious," was in an "altered conscious state," Dkt. No. 101 at 15-16, and declares under penalty of perjury he "had an acute altered mental status, altered level of conscious." *Id.* at 19. He does not explain how, being in such a state, he would know that he was never asked any questions or that he was nonverbal throughout his stay. James was verbal before he even left the scene of the crime, as shown in the video recording of his arrest. On that video recording, much of what he was uttering while he waited for the ambulance was gibberish, but some phrases -- such as his repeated statements "Ok, got that" at about 11:04, and "ok" at 16:04 on the recording as he apparently tried to calm himself -- are understandable speech. *See* Dkt. No. 96-8 (Exhibit A, manually filed).

In contrast to James' evidence that he was nonverbal, defendant's expert, Dr. Hugh West, declares that James had a GCS score of 15 when he left the hospital. Dkt. No. 80-2 at 6. To

4

receive a GCS score of 15, James would have had to be "oriented, convers[ing] normally." *See* Dkt. No. 80-1 at 85; Dkt. No. 101 at 22; *but see* Dkt. No. 80-1 at 56 (TTS form showing GCS scores of E-3, V-5 and M-6, which would indicate a GCS of 14).

James states that he "was suicidal" during his hospital stay. Dkt. No. 101 at 19. There is no evidence, however, that James told anyone at the hospital that he was suicidal. James states that his knee was injured, but there is no evidence that he told or otherwise informed anyone at the hospital of any problem with his knee. In one filing, James stated he did not notice his knee was "unoperable" until after he left the hospital and got to the jail. Dkt. No. 60 at 4.

A declaration from defendant's expert, Dr. Hugh West, provides the only expert evidence about the treatment of James.[2] According to Dr. West, the "standard of care for treating a patient such as [James] who has been tased includes review of his vital signs, removal of the taser barbs, local skin injury care, with some degree of observation and cardiac assessment." Dkt. No. 80-2 at 7. Dr. West opined "that Dr. English, Dr. Kang and Dr. Adler at all times complied with the standard of care, and that to a reasonable probability no alleged act or omission caused any of plaintiff's alleged injuries." *Id.* at 4. Dr. West also opined:

> There was no indication for a formal psychiatric consultation on this patient based on the overall evaluation reflected in the chart, especially in the absence of any indication of suicidal ideation. The patient followed commands readily. At the time of Mr. James' discharge, his GCS had improved to 15 (a perfect score), and he was in stable condition. Dr. English, Dr. Adler and Dr. Kang therefore appropriately discharged Mr. James to police custody with the expectation that he would be taken to a correctional facility, where he would be further observed and evaluated by the appropriate medical professionals for any medical or mental health issues which might subsequently emerge, if such an evaluation were warranted by the situation.

*Id.* at 7.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to this action occurred in Alameda County, located in the Northern

---

[2] Dr. Hugh West is board-certified in emergency medicine. He is an associate professor in the emergency medicine department at the University of California San Francisco (UCSF) and is an attending physician in the emergency department at UCSF. Dkt. No. 80-2 at 2-3.

5

District. *See* 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action under 42 U.S.C. § 1983, and supplemental jurisdiction over the state law claims. *See* 28 U.S.C. §§ 1331, 1367.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & fn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as an opposing affidavit where, even though verification was not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, James' complaint was signed under penalty of perjury and, therefore, is considered as evidence for purposes of deciding the motion.

6

The court's function on a summary judgment motion is neither to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id.* at 631. "If direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *Id.*

## DISCUSSION

A.  Professional Negligence Claim

James' medical malpractice claim arises under California law. In a medical malpractice action in California, the plaintiff must establish: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Hanson v. Grode*, 76 Cal. App. 4th 601, 606 (Cal. Ct. App. 1999).

In a medical malpractice action, the requisite standard of care can only be established by expert testimony because it "is a matter peculiarly within the knowledge of experts," *id.* (internal quotation marks and citation omitted), "unless the conduct required by the particular circumstances is within the common knowledge of the layman," *Willard v. Hagemeister,* 121 Cal. App. 3d 406, 412 (Cal. Ct. App. 1981). When a party moving for summary judgment supports his motion with an expert declaration that his conduct fell within the community standard of care, he or she is entitled to summary judgment unless the plaintiff presents conflicting *expert* evidence. *Munro v. Regents of Univ. of California*, 215 Cal. App. 3d 977, 985 (Cal. Ct. App. 1989).

The causation element in a medical malpractice case also must be established by expert testimony: "The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility

1  alone is insufficient to establish a prima facie case. . . . There can be many possible 'causes,'
2  indeed, an infinite number of circumstances which can produce an injury or disease. A possible
3  cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it
4  becomes more likely than not that the injury was a result of its action. This is the outer limit of
5  inference upon which an issue may be submitted to the jury." *Bromme v. Pavitt*, 5 Cal. App. 4th
6  1487, 1498 (Cal. Ct. App. 1992) (citations omitted). Thus, to show that a plaintiff's injuries were
7  "'caused by' defendant[s'] medical negligence," the plaintiff must "establish a 'reasonable
8  medical probability' that the negligence was sufficient of itself to bring about" the injuries, i.e., the
9  injuries were "'more likely than not' the result of the negligence." *Id.* at 1498-99.

10  Here, the doctor-defendants have supported their motion for summary judgment with
11  expert testimony. Dr. West described the standard of care; stated that the doctor-defendants
12  complied with that standard of care; and stated that, to a reasonable probability, no alleged act or
13  omission caused James' alleged injuries. Faced with such expert evidence, James was required to
14  present his own medical expert evidence to avoid summary judgment. He did not present any
15  such evidence. James' personal opinion about the quality of his care does not suffice to show a
16  triable issue of fact because he has not shown that he is a medical expert and does not show that
17  his situation -- a person who had been tased repeatedly and was mentally unstable -- is one where
18  the conduct required of doctors is within the common knowledge of a lay person. *See Willard*,
19  121 Cal. App. 3d at 412. James has failed to show a triable issue on the duty owed, any breach of
20  that duty, and causation -- all three of which are essential elements of a professional negligence
21  claim.

22  As to the duty and breach elements of a negligence claim, the undisputed evidence is that
23  the standard of care for a patient who has been tased includes "review of his vital signs, removal
24  of the Taser bars, local skin injury care, with some degree of observation and cardiac assessment."
25  Dkt. No. 80-2 at 7. It also is undisputed that defendants complied with that standard of care. With
26  regard to James' mental health needs, the undisputed expert evidence is that the defendant-
27  doctors' treatment was appropriate and they appropriately discharged James into police custody
28  where he would be taken to a correctional facility and be further observed and evaluated by

appropriate medical professionals for any medical or mental health issues that might arise. *Id.* Given James' failure to offer expert testimony that rebuts that provided by Dr. West, Dr. West's testimony is conclusive and demonstrates the failure of James' case on the duty and breach elements of his professional negligence claim. *See Starr v. Mooslin*, 14 Cal. App. 3d 988, 999 (Cal. Ct. App. 1971).

As to the causation element, the undisputed evidence is Dr. West's expert declaration that, to a reasonable probability, no alleged act or omission caused James' alleged injuries. Given James' failure to offer any expert evidence on point, his professional negligence claim fails on the causation element also.

The parties disagree whether James' GCS was 15 when he left the hospital and whether he was nonverbal. This disagreement does not show the existence of a genuine dispute of a material fact. James presents evidence that he was nonverbal the entire time he was at the hospital.[3] But even accepting his evidence that he was nonverbal the entire time he was at the hospital, he has provided no expert evidence as to the interplay of the GCS score and staying overnight in a hospital. That is, he presents no evidence that if a patient has a GCS score of any particular number or lower, the standard of care requires that he be kept in the hospital for observation. Thus, James' statement that he was nonverbal is not enough to show a breach of the applicable standard of care and avoid summary judgment. There is no competent evidence that it falls below the applicable standard of care to discharge from the hospital a patient who has a less-than-perfect GCS score. Moreover, James presents no evidence of any injury from not being kept longer for observation. He does not provide any medical or mental health records from his stay at the county jail to suggest that he needed treatment at the jail due to something being overlooked at the hospital. For example, there is no record of a mental health crisis during the next 24 or 72 hours

---

[3] If this case survived summary judgment, it is highly unlike that a jury would credit James' recollection that he was nonverbal throughout his hospital stay. James' ability to be an accurate historian is severely undermined by his statements that he was "not totally conscious," in an "altered conscious state," and "had an acute altered mental status, altered level of conscious." Dkt. No. 101 at 15-16, 19; *see also* Dkt. No. 60 at 4 ("was unconscious the majority of the time"); *id.* ("as soon as plaintiff awoke, he was transported to county jail"). Nonetheless, at summary judgment, the court will accept as true James' evidence that he was nonverbal.

1   after his arrival at the county jail (when he wanted to be at the hospital). And even if he had such
2   evidence, he does not provide any evidence that the medical staff at the county jail were unable to
3   address any such mental health crisis.

4   James makes numerous arguments, but they fail to show that summary judgment should
5   not be granted. He argues that the doctor-defendants should have done a toxicology report to help
6   him with his criminal case, but fails to present any evidence that the emergency department
7   doctors have any duty to gather evidence for the criminal trial of a patient. He argues that he was
8   suicidal, but fails to present any evidence that he articulated that to anyone at the hospital, or that
9   any of the doctor-defendants had a duty to address the unexpressed suicidal thoughts. James also
10  fails to show that, even if he was suicidal, how his discharge resulted in any harm to him, given
11  that he was discharged to a jail where there was a medical staff available to treat him. James also
12  argues that he needed treatment of his right knee, but fails to provide any evidence as to what the
13  needed treatment was, or how the doctors should have known of it, given the medical records that
14  showed he only had abrasions on his knee and his statements that he was nonverbal during his stay
15  in the hospital.

17  B.    Fraud Claim

18  James alleged in his "second amendment complaint for damages" that the doctor-
19  defendants committed fraud on him during his hospital stay. Dkt. No. 68 at 5-6. Like the doctor-
20  defendants, the court finds it extremely difficult to make sense of James' allegations of fraud. The
21  doctor-defendants contend that the fraud claim was inadequately pled and that there is no evidence
22  to prove such a claim. Due to the dearth of evidence to support the claim, there is no reason to
23  dwell on the poor quality of the pleading of the fraud claim.

24  The elements of fraud under California law are: "(1) misrepresentation (false
25  representation, concealment or nondisclosure); (2) knowledge of the falsity (or 'scienter'); (3)
26  intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Lazar*
27  *v. Superior Court*, 12 Cal. 4th 631, 638 (Cal. 1996).

James' fraud claim borders on the frivolous. He has failed to present evidence to establish or raise a triable issue of fact in support of his fraud claim. First, he presents no evidence of any sort of misrepresentation or concealment. Second, he presents no evidence that would allow a jury to find the necessary scienter for any of the doctor-defendants. Third, he presents no evidence of intent to defraud. Fourth, he presents no evidence of any reliance, let alone justifiable reliance, by him on any representation or non-disclosure by the doctor-defendants. On the evidence in the record, no reasonable jury could find in his favor on the fraud claim. Therefore, doctor-defendants are entitled to judgment as a matter of law on the fraud claim.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by Dr. English, Dr. Adler and Dr. Kang is GRANTED. Dkt. No. 80. With the granting of this motion, the court has now adjudicated all of the claims as to all of the defendants. Judgment will now be entered against plaintiff and in favor of all the defendants.

**IT IS SO ORDERED**.

Dated: June 20, 2016

SUSAN ILLSTON
United States District Judge